IN THE UNITED STATES DISRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| LATTHEN CHANCE DOUGLAS<br>　　Plaintiff | § | CIVIL ACTION NO.1:19CV306 |
| | § | HONORABLE TRUNCALE-HAWTHORN |
| VS. | § | |
| | § | COMPLAINT WITH JURY DEMAND |
| PEDRO M. BOYKIN, STEVE MASSIE, CALVIN<br>E. TUCKER, DARREN WALLACE, BRYAN L.<br>WILLIAMS, CHRISTOPHER L. NORSWORTHY,<br>ANTHONY J. NEWTON, KEVIN B. SMITH,<br>MICHAEL B. CROW, AARON L. THOMPKINS,<br>ROCKELLA NEAL, BRUCE H. FREDRICK,<br>ALONZO W. TURNER, THOMAS A. CORDLE<br>JR., LANCE C. KNOD, JEFFERY R.<br>WOODWARD, MARY L. GILDER, MICHELLE F.<br>BOYKIN, LORIE E. DAVIS, RENA A. KEAL,<br>JUZTIN K. STEWART, HAZEL A. DURANT III,<br>RAQUEL GONZALES, ASHLEY R. LOWE,<br>PATRICIA L. BANKS, HENRY L. BROWN,<br>APRIL L. CLARK, KOURTNEY L. HADNOT,<br>LATROYA BELL, CRYSTLE R. JOHNSON,<br>ROSHANDA Y. POULLARD, SHEDRICK D.<br>WILSON, DORETTA R. WATSON, SHARONDA  R.<br>HARRIS, JARROD, C. O'NEAL, KHIRY R.<br>WALKER, CHELSEA Y. PARKS, ANGELLA D.<br>THOMPSON, FRANCIS M. GABBA, JAMES M.<br>COOPER, EDWARD DELONE, GEORGE MILLER,<br>RICKY TARVER, JEANNE BELLANGER,<br>DYNETTEE JOHNSON, DUYEM BUI, sued in<br>their individual and official<br>capacities, TEXAS DEPARTMENT OF<br>CRIMINAL JUSTICE, UNIVERSITY OF TEXAS<br>MEDICAL BRANCH,<br>　　Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

## AMENDED VARIFIED COMPLAINT WITH JURY DEMAND FOR DAMAGES AND INJUNCTIVE RELIEF

### I. INTRODUCTION

1. This is a civil rights action under 42 U.S.C.§1983, filed by Latthen Chance Douglas, Plaintiff, pro se, a stste prisoner, involving the administration of the Mark W. Stiles Unit (Stiles) of the Texas Department of Criminal Justice-Correctional Insitutions Division (TDCJ) of the State of Texas, and the private

medical company University of Texas Medical Branch (UTMB).

2. This complaint alleges violations of Plaintiff's constitutional rights and federal laws for: 1) denial of adequate medical care; 2) sexual abuse and misconduct; 3) excessive and unnecessary use of force; 4) deprivation of plumbing and exposure to hazardous toxic sewage; 5) unsanitariy housing and chow halls; 6) exposure to dangerous evironmental toxic smoke; and 7) denial of free speech, redress of grievances, due process, and retaliation.

## II. JURISDICTION AND VENUE

3. Jurisdiction and action of this Court is invoked pursuant to 28 U.S.C.§ 1331, in that this is a civil action arising under the constitution of the United States of America.

4. Jurisdiction and action of this Court is invoked pursuant to 28 U.S.C.§ 1343, in that this action seeks to redress the deprivation, under color of state law, of rights secured by acts of congress providing for equal rights of persons within the jurisdiction of the United States of America.

5. The United States District Court, Eastern District of Texas, Beaumont Division, is an appropriate venue under 28 U.S.C.§1391(b)(2), because it is where the events giving rise to this claim occurred.

6. This Court is authorized to grant declaratory relief pusuant to 28 U.S.C.§§ 2201 and 2202, the Americans with Disabilities Act, and the Federal Rehabilitation Act.

7. This Court is authorized to grant injunctive relief pursuant to 28 U.S.C.§§ 1651, 2283, and 2284; Rule 65 of the Fed. Rules of Civ. Proc.; the Americans with Disabilities Act; and the Federal Rehabilitation Act.

## III. PARTIES

8. Plaintiff Latthen Chance Douglas, is and was at all relevant times, confined by TDCJ, at the Stiles Unit, 3060 FM 3514, Jefferson County, Beaumont, TX. 77705.

Plaintiff has been transferred since the original filing of this complaint to the Mark W. Michael Unit, 2664 FM 2054, Tennessee Colony, TX. 75886.

9. Defendant Pedro M. Boykin (P. Boykin), is and was at all relevant times, employed with TDCJ as Captain at Stiles. He is legally responsible for the welfare and safety of all inmates housed at Stiles, and investigating grievances and other incidents of inmates. He is also responsible for the training, supervising, and discipline of Lieutenants, Sergeants, and Correctional Officers (CO).

10. Defendant Lorie E. Davis (Davis), is and was at all relevant times, employed by TDCJ as Director of TDCJ. She is legally responsible for overall operations of TDCJ, and the welfare and safety of all TDCJ inmates, employees, and volunteers.

11. Defendant Steve Massie (Massie), is and was at all relevant times, employed by TDCJ as Assistant Regional Director. He is legally responsible for overall operations of all TDCJ units in his region, and the welfare and safety of all inmates housed within his region. He is also responsible for investigating grievances and other incidents of inmates.

12. Defendants Calvin E. Tucker (Tucker), Darren Wallace (Wallace), and Bryan L. Williams (Willians) is and was at all relevant times, employed by TDCJ as Senior wardens at Stiles. They are legally responsible for overall operations of Stiles, welfare and safety of inmates housed at Stiles, training, supervising, and discipline of all employees of Stiles. They are also responsible for investigating grievances and other complaints by inmates, including disciplinary charges and convictions.

13. Defendants Christopher L. Norsworthy (Norsworthy), Michael B. Crow (Crow), and Anthony J. Newton (Newton) is and was at all relevant times, employed by TDCJ as assistant wardens of Stiles. They are legally responsible for assisting the senior warden with overall operations of Stiles, welfare and safety of inmates

3.

housed at Stiles, training, supervising, and discipline of employees of Stiles. They are also responsible for investigating grievances and other complaints by inmates.

14. Defendants Rockella Neal (Neal), Bruce H. Fredrick (Fredrick), Aaron L. Thompkins (Thompkins), and Alonzo W. Turner (Turner) is and was at all relevant times, employed by TDCJ as majors at Stiles. They are legally responsible for the welfare and safety of inmates housed at Stiles, training, supervising, and discipline of employees of Stiles. They are also responsible for investigating grievances and other complaints by inmates.

15. Defendants Lance C. Knod (Knod), Jeffery R. Woodward (Woodward), and Mary L. Gilder (Gilder) is and was at all relevant times, employed by TDCJ as captains at Stiles. They are legally responsible for the welfare and safety of inmates housed at Stiles, training, supervising, and disciplining of their subordinate employees of Stiles. They are responsible for investigating grievances and other complaints by inmates. Gilder is supervisor of food service department. Knod is a disciplinary hearing officer.

16. Defendants Thomas A. Cordle (Cordle), Michelle F. Boykin (M. Boykin), Rena A. Keal (Keal), Juztin K. Stewart (Stewart), and Hazel A. Durant III is and was at all relevant times, employed by TDCJ as lieutenants at Stiles. They are legally responsible for the welfare and safety of inmates housed at Stiles, training, supervising, and disciplning of their subordinate employees of Stiles. They are disciplinary hearing officers for minor cases.

17. Defendants April L. Clark (Clark), Patricia L. Banks (Banks), Henry L. Brown (Brown), Kourtney L. Hadnot (Hadnot), Latroya Bell(Bell), Crystle R Johnson (C.R. Johnson), Raquel Gonzales (Gonzales), Ashley R. Lowe (Lowe), Roshanda Y. Poullard (Poullard), Shedrick D. Wilson (Wilson), Doretta R. Watson (Watson), Sharonda R. Harris (Harris), Jarrod C. O'Neal (O'Neal), Khiry R. Walker (Walker),

Chelsea Y. Parks (Parks), Angella D. Thompson (Thompson), and James M. Cooper (Cooper) is and was at all relevant times, employed by TDCJ as sergeants at Stiles. They are legally responsible for the welfare and safety of inmates housed at Stiles, training, supervising, and disciplining COs.

18. Defendant Francis M. Gabba (Gabba) is and was at all relevant times, employed by TDCJ as CO at Stiles. He is legally responsible for the welfare and safety of inmates housed at Stiles.

19. Defendant Antionette E. Manual (Manual) is and was at all relevant times, employed by TDCJ as counsel substitute at Stiles. She is legally responsible for the welfare and safety of inmates housed at Stiles.

20. Defendant Edward Delone (Delone) is and was at all relevant times, employed by UTMB as senior practice manager at the Stiles infirmary. He is responsible for the welfare and safety of inmates housed at Stiles, reporting complaints by inmates to the appropriate TDCJ and/or UTMB supervisor(s), investigating and responding to medical grievances and other complaints by inmates, and supervising, training, and discipline of UTMB staff at Stiles.

21. Defendant George Miller (Miller) is and was at all relevant times, employed by UTMB as a doctor charged with the duty of providing professional medical services to inmates at Stiles.

22. Defendant Jeanne Bellanger (Bellanger) is and was at all relevant timed, employed by UTMB as a registered nurse supervisor at the Stiles infirmary. She is charged with the duty of providing professional medical services within her scope of practice to inmates at Stiles.

23. Defendants Dynette Johnson (D. Johnson), Duyen Bui (Bui), and Ricky Tarver (Tarver) is and was at all relevant times, employed by UTMB as licensed vocational nurses at the Stiles infirmary. They are charged with the duty of providing professional medical services within their scope of practice to inmates at Stiles.

24. Defendant University of Texas Medical Branch is a private Texas Corporation

which has been, at all relevant times, under a contrct with TDCJ to provide medical care and services to inmates confined with TDCJ at Stiles.

25. At all relevant times to this complaint, all defendants have acted, and continue to act under color of state law.

26. All defendants are sued in their individual and official capacities and severally, for their acts and omissions as described in this complaint.

### IV. PREVIOUS LAWSUITS

27. Plaintiff has never before filed a civil suit, nor has there been previous litigation regarding any of the issues in this complaint prior to its filing.

### V. EXHUASTION OF ADMINISTRATIVE REMEDIES

28. Plaintiff has exhuasted his administrative remedies with respect to all claims and all defendants in this complaint. Plaintiff used informal resolutions, such as, verbal communication with prison and medical staff, I-60s, sick calls, and letters and affidavits. Plaintiff used the TDCJ grievance system.

### VI. STATEMENT OF FACTS

### CLAIM ONE: DENIAL OF ADEQUATE  MEDICAL CARE-DIABETIC TREATMENT

29. Upon belief and information, other diabetic inmates have faced the same or simular acts or ommissions on or about the same dates and times as Plaintiff while housed at Stiles. Upon belief and information, other inmates have spoken to prison and medical staff and/or filed grievances about delayed or denied diabetic treament, and met with indifference as Plaintiff, or with threats and different forms of retaliation.

30. Plaintiff's troubles with receiving adequate diabetic treatment started when he was asigned to Stiles in November 2011. Upon belief and information, other diabetic inmates' problems with getting adequate diabetic treatment started when they arrived at Stiles.

31. While improperly housed in twelve building administration(Ad Seg), Plaintiff was denied or delayed medical treatment. He spent most days locked in his cell

6.

and severe security measures were taken against him as if he were a G-5 level inmate.

32. Plaintiff was not allowed to walk to the infirmary on his own for diabetic treatment or mental health and medical appointments, as other inmates of his custody level in general population.

33. Anytime Petitioner left his cell he was forced to strip searches, then handcuffed to a waistbelt and escorted. The handcuffs were often too tight and began making imprints and sores. Petitioner complained about it but was told it was how they were suppose to be, or told to shut up , get over it, thought shit.

34. Because of these security measures and being understaffed, Petitioner routinely missed diabetic treatmentments, mental health counseling, and other medical appointments. Also, Petitioner would be significantly delayed in receiving his meals after diabetic treatment or miss meals because of improper times of treatmentment.

35.  During appointment times or when Petitioner felt bad he had to bang on his cell door and yell to try to get the guards' attention, which could take several hours. Petitioner rarely saw guards eccept during count time, but would not see them sometimes during that time. Security failed to do proper consistent security or wellness checks as required by TDCJ policy.

36. When Petitioner  was able to speak with guards about the issues he was having with his diabetic treatment, medical appointments, and being fed he received varying responses and hostile vulgar answers. They told him they didn't care and that he could die for all they cared. Petitioner also spoke with medication aides and D. Johnson. D. Johnson ignored Petitioner's pleas for help. She told Petitioner she didn't care. She said, "Its the way prison is, so get used to it."

37. Other responses Petitioner received from guards included: I don't care. Its not my job. Cry to somebody else. Why don't you write another grievance and see where that gets you? Tell somebody else. We are understaffed. Understaffing

7.

is one of the most quoted responses to Petitioner from prison staffed about any issues at Stiles.

38. Petitioner on numerous occassions requested to speak with security supervisors during this period. His request was met with hostility or simply ignored. Although, 13 August 2017, Petitioner was able to speak with Sgt. Lavine about his issues. Lavine told Petitioner he would see what he could do and inform M. Boykin; P. Boykin's wife. Lavine said that security has been very understaffed, so that's why things have been the way they have for so long.

39. M. Boykin came to speak with Petitioner later that same day. She was hostile and vulgar with Petitioner yelling at him for a while. She told Petitioner if he wasn't always writing them grievances then he wouldn't be where he was. She eventually told Petitioner that she would take care of him.

40. M. Boykin moved Petitioner to cell E-53, within Ad-Ag. It was a top row cell. Douglas informed M. Boykin about his medical restrictions and showed his pass with bottom row and bottom bunk restricted. M. Boykin yelled at Petitioner and said, "Stop whinning and deal with it. It won't kill you. I'm not moving you anywhere else, because your staying in twelve building for a while, so get comfortable."

40. On 14 August 2017, Petitioner submitted a Step One grievance. It was substantiated, but did not address all complaints. Petitioner, then filed a Step Two grievance and it was also substatiated, but did not address all issues.

41. On 27 November 2017, Petitioner was called to the front desk of eight building where he was housed to speak with the building officer. She told Petitioner that Chaplain Spears requested him at the chapel and wrote him a pass. Petitioner showed his diabetic treatment pass and said he had been waiting to go, but couldn't get off the section. He asked if he could go prior to going to the chapel. She told him yes.

42. On the was to the infirmary Petitioner was stopped by B-turnout officer at eight gate. There was approximately twentyfive inmates lined up there to go to chow.

8.

The officer asked where he was going and Petitioner showed him his passes.

43. After varifying Petitioner's passes the officer let him continue on, then immediately told the inmates to go to chow. Petitioner ended up mixed in with them. P. Boykin was standing in the middle of the sidewalk between B-turnout and eight chow how as Petitioner approached him. Upon information and belief, P. Boykin regularly patrols this area harrassing inmates, because he knows there are no security cameras there.

44. P. Boykin yelled for Douglas to get out of line and go back to the building. Upon information and belief, P. Boykin does this on a regular basis to inmates for harrassment and to get them to react. This is in order to be able to hand cuff them and use an unprovoked unecessary excessive use of force. Upon information and belief,  P. Boykin also doe this as a way of retaliation to inmates that files grievances and have their families call the unit warden or Huntsville to complain.

45. Petitioner complied and approached P. Boykin to explain about treatment and the chapel. Petitioner showed him the passes. P. Boykin said, "Fuck your insulin pass. I don't give a fuck. I don't care if the chaplain called you out. Go back to the building. Your not going anywhere. P. Boykin then slapped the passes out of Petitioner's hamd. He attempted to pick them up, but P. Boykin pulled back his leg as if to kick Petitioner in the face and said, "Leave them on the ground or you will regret it.

46. Upon information and belief, P. Boykin is known to follow through with his threats and been know to beat inmates severely, and even been indicted for killing them. Therefore, Petitioner was afraid and left them there on the ground. Petitioner asked P. Boykin if he was denying him insulin? P. Boykin told Petitioner, "Fuck you. Go to the building."

47. Petitioner informed Boykin that he was going to file a grievance and call his family to report him to the warden and Huntsville for denying insulin and assaulting him. P. Boykin became extremely enraged and started yelling at Petitioner.

9.

48. P. Boykin told Petitioner, "Fuck your mama. You just fucked up. Now I'm going to lock you up for creating a disturbance." Petitioner was terrified at what P. Boykin would do to him. Previous encounters with him to this point had all been met with verbal abuse and threats.

49. Upon information and belief, P. Boykins locks inmates up in eleven or twelve buildings out of retalliation and to keep them from contacting their family to report his actions, while writing false disciplinary charges. Upon information and belief, his wife M. Boykin, helps him in his retalitory actins, which may be to improperly house inmates in Ad-Seg and move them from cell to cell. This causes chaos with mail, grievances, medical appointments, and doing proper disciplinary prehearing investigations. This may cause significant delays or loss of mail, grievances, and lay-ins.

50. Petitioner was arrested by P. Boykin and taken to the infirmary for a Prehearing Detention Exam (PHD). While at the infirmary Petitioner told the nurse doing the PHD exam that he was being denied his diabetic treatment by P. Boykin. The nurse then did Petitioner's treatment.

51. On 11 December 2017, Petitioner filed a Step One grievance. It came back as unsubstantiated and no action warranted. Petitioner then filed a Step Two grievance. It came back unsubstantiated and no further action warranted.

52. On 5 December 2017, Petitioner spoke to D. Johnson about not receiving mid-day diabetic treatment while house in Ad-Seg. He asked her if she had been on the building during this time, which she responded yes.

53. Petitioner asked D. Johnson why she hasn't been giving diabetic treatment to him during prescribed times. She stated that she had been too busy, but would try to do it from now on. Petitioner also asked about getting his diabetic snacks, but told him it was not her responsibility.

54. Later that evening, Petitioner didn't receive his treatment until after D. Johnson's shift change and after the prescribed time. Prior to leaving she told

Petitioner she wouldn't be able to do his treatment before she left, be cause she had been too busy. D. Johnson told Petitioner that he would have to go to ten building infirmary for treatment. This is a nearly impossible task from Ad-Seg.

55. Upon information and belief, her medical coworkers, prison staff, and inmates she is slow at her duties, doesn't finish her duties and leaves extra work for her coworkers-including diabetic treatment-and spends a significant amount of time sitting in the medication room with her friend medical aide Brown in Ad-Seg.

56. On 6 December 2017, Petitioner filed a Step One grievance. It came back unsubstantiated. Petitioner filed a Step Two grievance on 7 June 2018. It came back an isolated incident.

57. On 23 December 2017, while housed on seven building through 26 December 2017, Petitioner had a difficult time getting to the infirmary for diabetic treatment and was either delayed or denied treatment. During the above dates and others Petitioner is forced to choose to eat prior to receiving diabetic treatment or not at all, because he was not allowed to go to the infirmary on time for treatment. Also, while at the infirmary wait times for treatment may be long.

58. During each of the above dates above Petitioner has spoken to guards and supervisors, including Hadnot, about being delayed or denied diabetic treatment and being able to eat a meal after treatment. Petitioner was told either the infirmary wasn't ready; next shift will have to do it; We are short staffed; You know how shit runs around here; and oh wel, get over it. Hadnot told Petitioner, "Your building already ate and the chow hall is closed to GP, so protective custody is being fed. You should have ate before going to the infirmary."

59. Petitioner tried explaining that he could not get his blood sugar checked after he ate, because it will throw the numbers off potentially making him take more insulin than he needs. This in turn could make Petitioner's blood sugar drop too low causing medical complications. Also, if Petitioner misses a meal after receiving insulin it could do the same.

60. Hadnot told Petitioner that she didn't care and would not eat. Petitioner told Hadnot he would file a grievance. Hadnot told Petitioner, "Get the fuck out of my face before I slap you. I'm going to luck your ass up if you don't leave."

61. Petitioner went back to his building where later that evening his blood sugar dropped making him feel terrible. He asked to go to the infirmary, but was denied. He asked for some food from another inmate to eat and bring his blood sugar back up.

62. On 27 December 2017, Petitioner filed a Step One grievance. It was returned as redundant, refer to grievance number 2018068683. On 5 February 2018, Petitioner filed a Step One grievance in response to grievance number 2018068683. It was returned unanswered with G2 IOC attached stating grievance number 2018081544 was properly screened. Petitioner filed a Step Two and attached the G2 IOC. It was returned unanswered, but the G2 IOC was marked that grievance number 2018068684 was under review. Upon information and belief, the unit grievance department is known to improperly screen grievances, improperly date-stamping  the wrong date, delaying date-stamping grievances, delaying in picking up grievances from the grievance boxes or from eleven building and Ad-Seg, losing or misplacing grievances, or failing to make in the housing areas.

63. From approximately 29 December 2017 to 6 January 2018, Petitioner was having difficulty getting to the infirmary for diabetic treatment and being able to eat a meal after treatment, or being able to finish a meal without being rushed and yelled at. Prison staff wanted to close the chow hall and make all the inmates leave just within receiving trays.

64. As in the past, Petitioner spoke with prison staff, including, but not limited to, Hadnot, Banks, Thompson, Durant, Woodward, P. Boykin, and Harris. He was met with the same hostile and vulgar threats as in the past confrontations.

65. On 8 January 2018, Petitioner filed a Step One. It came back as no merit found to support claim and no further action warranted. On 27 April 2018, Petitioner

12.

filed a Step Two grievance. It came back as no evidence to substantiate your
allegations and no further action warranted.

66. On 8 April 2018, Petitioner informed seven building rovers and P. Boykin
that he had been having a hard time getting diabetic treatment or been significantly
delayed in receiving treatment. P. Boykin was verbally abusive twards Petitioner and
threatened to lock him up if he didn't get the infirmary passes out of his face. He
was not able to receive treatment.

67. On 10 April 2018, Petitioner informed seven building rovers and desk
officer Sam about going to diabetic treatment in the evening. Sam told Petitioner
that he had to wait until next shift. Petitioner received treatment past the
prescribed time at approximately 1845 hours.

68. During 8 and 10 April encounters with P. Boykin he was told to, "Rack up or
get locked up. We are short staffed, so you will have to wait. Now get the fuck out
out of my face before you get it beat." The other prison staff told Petitioner its
not the building's time to go or I don't care about your insulin.

69. On 27 April 2018, Petitioner filed a Step One grievance. It came back as
unsubstantiated and no action warranted. Petitioner filed a Step Two grievance on
27 June 2018. It came back no evidence and no further action warranted.

70. On 29 August 2018, Petitioner was on his way to evening diabetic treatment.
He was stopped at ten gate by Cooper and asked where he was going. Petitioner
presented his diabetic pass and TDCJ ID card. Cooper told Petitioner he couldn't
go to the infirmary.

71. Petitioner told Cooper he had to get his treatment and was already late,
because he had a hard time getting off the building. Cooper told Petitioner tough
shit. Petitioner told Cooper he would file a grievance on him for denying insulin.

72. Cooper told Petitioner that if anybody asked him he would say that Petitioner
Petitioner refused to go to the infirmary for treatment. Petitioner told Cooper
he was not refusing treatment and that he was lieing. Petitioner told Cooper his

blood sugar was high and that he wasn't feeling good. Cooper told Petitioner that he didn't give a fuck.

73. Cooper started yelling sexual inuendos a Petitioner. Cooper commented that all Petitioner wanted to do was go to the infirmary so that he could suck dick and fuck punks. Cooper was yelling that Petitioner was a homosexual, which was taking place with inmates and officers standing at the gate or in the vicinity.

74. The inmates at the gate were coming from and trying to get to the infirmary. The officers were coming off shift from Ad-Seg, which seemed frustrated at Cooper telling him to stop and let everybody through the gate.

75. Cooper responded to Petitioner that he was just another dick sucker and looked like he wanted to suck Cooper off. As officers and inmates were continued to get through the gate, Cooper said he was going to call in a hostage threat and write everyone cases. Petitioenr was requesting rank, whcih he refused. Petitioner asked the other guards for help, but they just laughed and said they were on there way home.

76. Cooper then started shoving and hitting Petitioner while calling him a pussy and other names. Petitioner imedicately layed on the ground asking Cooper to stop. Cooper continued hitting Petitioner on the groun calling him a big pussy and to get up.

77. Cooper took the gate swinging it into Petitioner. As the gat was hitting him Petitioner put up his hands to protect his was and went into the fetal position. The gate hit Petitioner in the hands, head, and shoulder causing extreme pain.

78. Petitioner requested rank several times again and for help, but was denied. Eventually Cooper stopped hitting Petitioner with the gate and told him to get the fuck out of there and go see the punks in the infirmary. Once at the informary Petitioner told the guard stationed there and nurses what happened. They told him.

14.

to file a grievance. Although, they would not call rank, do an incident report, or an exam of the scrapes and bruising.

79. On 31 August 2018, Petitioner filed a Step One grievance. It came back unsubstatiated and no futher action warranted. Petitioner filed a Step Two grievance 27 September 2018. It came back as insufficient evidence and no further action will be taken.

80. On 12 November 2018, Petitioner was heading to the infirmary for diabetic treatment. Petitioner started getting nervous and fearing what Cooper might do to him, because Cooper was at Ten gate again. Cooper started yelling pussy and other vulgar remarks, making sexual enuendos with body motions, threaten to beat Petitio Petitioners ass, and write some kind of false disciplinary case to get him locked up. Cooper told Petitioner that he shouldn't have snitched on him to rank and wrote that grievance.

81. Petitioner respectfully asked Cooper to please leave him alone and that he wasn't disrespecting him in any way or trying to talk to him. Cooper was blocking Petitioner's way to the infirmary at the gate entrance and kept on harrassing Petitioner for a while. Eventually, Cooper let Petitioner through.

82. After receiving diabetic treatment Petitioner left the infirmary and headed to ten gate where Cooper was waiting on him. Cooper again started tuanting and calling Petitioner vulgar names. Petitioner asked Cooper to stop. Cooper told him, "Fuck you. You shouldn't have wrote that grievance against me punk. You can suck my dick bitch ass snitch."

83. Shortly after the incident strated mental health clinician Mary McFarland (McFarland), walked up to ten gate on her way to the infirmary coming from the direction of the OM gate. She stood there for a little bit watching the incident against Petitioner. There were other inmates and officers standing at ten gate also.

84. Petitioner asked McFarland to help him. He asked if she was hearing what Cooper was saying to him? Petitioner told her that Cooper was said he was going to

write a case for attempting to escape. McFarland said, "Yes. I heard what Cooper was saying to you. And no, you are not going to write him an escape case, because he isn't trying to escape." She then spoke with Cooper for a few minutes telling him he shouldn't talk to inmates that way.

85. McFarland took Petitioner's name and ID numer and told him that she would email the warden about the incident. She told Petitioner to submit a sick call if he needed to talk to her about the incident, which he did right away.

86. The next day mental health clinician David Hamel (Hamel), went to Petitioner's cell and pulled him out to talk to him. They sat down at a table and talked about the incident with Cooper the previous day. Hamel told Petitioner to submit a grievance about the incident.

87. On 20 November 2018, Petitioner filed a Step One grievance. It came back no evidence to support the allegations and no action warranted. Petitioner filed a Step Two grievance on 8 January 2019. It came back as unsubstantiated and no further action warranted by this office.

88. On 27 Novemebr 2018, Petitioner was in his cell and informed rover Bennett that he had a provider appointment and that he didn't feel good, that he was very depressed and felt like hurting himself. Bennett told Petitioner that he was not going to let him out and walked off.

89. After morning count Petitioner again informed Bennet about his provider appointment, needing to talk to mental health, and that it was now time to go to mid-day diabetic treatment. Bennett told Petitioner no, and that he was too busy doing something else. Petitioner tried showing his lay-ins, passes, and mental health restrictions. Bennett refused to look at them. Petitioner requested to talk to rank. Bennett said no and walked away.

90. At approximately 1345 hours, the other rover came by Petitioner's cell and Bennett was in the picket. Petitioner told the officer what he told Bennett and presented his passes, which he looked at.

16.

91. The officer told Petitioner that Bennett never told him anything about the appointments or wanting to hurt himself. The officer told Petitioner that he would talk to Keal and be right back and let Petitioner out of his cell.

92. Keal was on the section and the officer went to Keal. Keal yealled, "what now?" The officer returned to Petitioner and told him Keal would be done in a moment and would talk to him.

93. After coming down from the upper rows Keal got within inches of Petitioner's faces and started yelling, "What the fuck is your deal? What the fuck do you want? Can't you see that I am busy with other shit?" Petitioner explained to her what he explained to Bennett and the other officer. He presented his passes and said he needed to talk to a mental health counselor.

94. Keal pulled out her chemical spray and pointed it at Petitioner. She told Petitioner to get out of the way or that she would spray him. She said, "I don't give shit about your passes right now. I don't care you want to talk to mental health." Petitioner told Keal that he wasn't doing anything to warrant being sprayed, so please don't.

95. Keal eventually stopped aimming the spray and put it up. Petitioner tried again explaining he had been trying to get to medical all morning and was feeling bad. He told her he just needed to talk to someone in mental health for a little bit. Keal told Petitioner to get into D-space until she came back. Keal took Petitioner's passes. She said, "Bennett never told her about any problems or appointments. I am going to call medical about these lay-ins. I am going to keep these passes and copy them so that I can write Bennett up."

96. After a few minutes the officer returned and told Petitioner, "Don't get mad. Keal told me to put you back in your cell and that you would have to wait until after count to go to medical." Petitioner complied. He did not receive his diabetic treatment and missed his appointment.

97. After count the officer came back and let Petitioner out of his cell. He

17.

was told to wait in the dayroom, because Keal told him that Petitioner wasn't going to the infirmary anytime soon.

98. After a while officer Lewis came into the section with a move cart and told Petitioner to pack up his property, because he was getting moved to Ad-Seg. Petitioner asked Lewis why he was getting moved? She gave him a smirk and said Keal said so. Petitioner explained about his diabetic treatment and wanting to talk to mental health, because he felt like hurting himself.

99. Lewis told Petitioner that she didn't care about any of that. She told him that it was too late to talk to mental health. She told Petitioner to pack his property or she would lock him up and do it herself.

100. Petitioner requested to speak with rank. Lewis said, "I'm not getting any fucking rank. Go pack your shit." She then raised her hand and swung at Petitioner. Petitioner turned his back towards her as her hand hit it. She then lifted her radio and swung it at Petitioner hitting him in the back.

101. Keal arrived just as the radio hit Petitioner Petitioner asked Keal if she saw Lewis hit him on the back with her radio and said she also punched him in the back. Keal laughed at him and said, "I didn't see anything. Go pack your shit or you will regret it."

102. Petitioner requested to speak with higher rank. Keal refused to call rank and laughed at him. Keal said, "Go pack your shit. You are not going to the infirmary, You are going to Ad-Seg."

103. Petitioner asked Keal to call an ICS so that rank and a video camera would be there. She refused. Petitioner said he would file a grievance on her and Lewis for their actions. Keal said, "I don't give a fuck. Turn one in, because I just got off probation and have bond money, even if I did get in trouble."

104. Petitioner packed his property and Lewis and he headed to Ad-Seg. She told Petitioner she would stop at the infirmary on the way, but kept going past it. He asked her if he could go into the infirmary to take care of everything. Lewis

just smiled at Petitioner and told him that she wasn't going to let him go to the infirmary, and they proceeded to Ad-Seg.

105. After being mishoused in Ad-Seg Petitioner informed rovers and ranking officers about needing diabetic treatment and feeling bad, he hadn't eatten, that he felt very depressed, and felt like hurting himself and killing himself. They either ignored hi, laughed at him, berated him, and even encouraged him to kill himself.

106. Petitioner had to continue to bang on his cell door and scream for help for approximately two days before he was able to speak with someone from mental health.

107. Upon information and belief, Keal falsifies documents and reports, as well as, misinforms prison staff to be able to move and mishouse inmates-mainly Ad-Seg and eleven building-as retaliation.

108. On 27 November 2018, Petitioner files a Step One grievance. It came back addressed and no further action warranted. Petitioner filed a Step Two on 11 January 2019. It came back addressed and no further action warranted. Futher it stated that Petitioner was reclassified from G-4 to G-5. Petitioner has never been served a case in regards to this issue, been to a disciplinary hearing, not to unit classification to be classified as G-5. Upon information and belief, Keal fabricated documents to make Petitioner out to be a G-5 inmate.

109. While improperly housed in Ad-Seg Petitioner was delayed or denied diabetic treatment, other medical appointments, and mental health counseling. He spent most days twentyfour hours locked in his cell under severe security measures, without recreation, and without showers, although he is medically prescribed showers. As told to him by prison staff, it is because they were extremely understaffed.

110. Guards rarely did security checks or wellness checks as required at least every thirty minutes per TDCJ policy. Count time was the rare occassions Petitioner would see guards, but sometimes not even then. Upon information and belief, guards

falsify the documents for security and wellness checks and count to make it look as if they had done them.

111. On several ocassions Petitioner informed guards and rank that he wanted to talk to mental health, because he felt very depressed and his aniety was peaking. He told them that he just wanted to talk withmental health so he wouldn't harm himself. When requesting for rank the guards told him no. Petitioner only got to speak with rank when they were passing by dealing with other inmates.

112. The prison staff for the most part ignored him. On other ocassions they made fun of him and called him vulgar names, or told him good luck, trying to encourage him into killing himself.

113. The main persons Petitioner was able to speak with during these times were M. J. Johnson, M. Boykin, Levine, Brown, Poullard, Stewart, and Woodward. They for the most part has they same resposes as above to Petitioner.

114. On 7 December 2012, Petitioner filed a Step One grievance. It came back housing assignment within guidelines and no action warranted. It failed to address the issues. Petitioner filed a Step Two on 11 January 2019, and attached an SSp-120 that he received from unit classification. It sated, "Mishoused due to lack of G-4 level space." The Step Two came back G-3 offenders can be housed in 12 building D-Pod and no further action is warranted.

115. Petitioner was moved to D-Pod within Ad-Seg, and was reclassified as G-3 while the grievances were being processed. The Step Two did not address the original issues.

116. On 4 January 2019, Petitioner went to Ag-Seg nurses station for mid-day diabetic treatment. D. Johnson did not open the diabetic log to Petitioner's flow sheet to varify the proper insulin dosage, nor log in the finder stick results or the dose of insulin given. Petitioner asked why she didn't do any of that and how much insulin did she inject him with. She told him she would do it later and that what he was suppose to get.

117. Later that same day Petitioner went for his evening treatment at approximately 1650 hours. Petitioner asked what his mid-day results were to see if D. Johnson logged, because the diabetic log book was open to his name. Petitioner could see the results were not logged in. D. Johnson had to scroll through the glucometer to find Petitioner's results and gave them to him. She still did not log the results in.

118. After eatting chow Petitioner was able to go to ten building infirmary. He spoke with with officer Durant and requested to speak with a medical supervisor to report D. Johnson's actions.

119. Durant started yelling at Petitioner and calling him a snitch in front of other inmates and medical staff. Durant said, "Get the fuck off this building before something happened to you. You should stop writing all those grievances on everybody." Durant asked for Petitioner's ID, which he complied. Durant wrote his information down and said he was writing him a case.

120. On the was from the infirmary Petitioner noticed a Lieutenant at ten gate running chow. He approched the Lt. and explained about D. Johnson and what happened with Durant. He told Petitioner not to worry about the case, because he would take care ot it. He said, "Just ignore Durant, because he is just mad from losing his rank and is taking it out on inmates." The Lt. told Petitioenr to submit a grivance about the situation.

121. On 5 January 2019, Petitioner and other inmates were at Ad-Seg nurse station waiting for D. Johnson to do diabetic treatment at approximately 1615 hours. Petitioenr was told by other inmates that had been waiting there since 1530 hours that they were told by guards they haven't seen her for hours.

122. At approximately 1640 hours, Petitioner told Watson about D. Johnson not being at her office and everbody has been waiting a long time for diabetic treatment. Also, that some inmates gave up waiting and left. Watson told Petitioner she didn't care about D. Johnson not doing insulin and was too busy to look for her.

123. Petitioenr asked Watson if the chow hall was going to stay open for the diabetics? Watson told Petitioner and the others that they better go eat now, because the chow hall is about to close. Petitioner expalined that they couldn't eat before they checked their blood sugar. She said, "Oh well, then don't eat."

124. D. Johnson eventually arrived at approximately 1650 hours. Petitioner and the other diabetics received their treatment at approximately 1700 hours, then headed for the chow hall. It was closed, so Petitioner spoke with food service manager Keal and explained about D. Johnson being late giving treatments. She managed to find some leftovers and put trys together. Normally, as in past similar situations, diabetics wouldn't have been fed.

125. On 8 January 2019, Petitioner filed a Step One grievance. It came back unresolved. Petitioner filed a Step Two grievance on 23 April 2019. It came back stating Petitioner received his finger sticks, he can refuse treatment, but it did not address the complaints.

126. On 26 February 2019, the Ad-Seg rover went to Petitioner's cell at approximately 0230 hours, to let him out of his cell for diabetic treatment. Petitioner stated that is was way too early for treatment. The rover told Petitioner that Bui told twelve control that diabetics need to go to the infirmary for treatment now or not get it at all.

127. Petitioner went to ten building infirmary and told Bui it was too early for treatment, because the diabetics would be waiting in the dayroom for several hours after treatment before they could eat a meal. Bui said that was a security issue

128. Petitioner spoke with the following medical staff about how Bui has been operating morning diabetic clinic: Laura Midkiff, Melinda Ross, Tia Overstreet, Jessica Judy, Kathryn Claud, Miranda Granger, Lori Walker, and Karmyn Leal. They confirmed that was not normal proceedures and can't allow diabetics to go that long without eatting after getting insulin.

22.

129. Each nurse confirmed the hours of diabetic treatment hours as follows: Morning diabetic clinic is 0300 hours to 0545 hours. Mid-day diabetic clinic is 1000 hours to 1200 hours. Evening diabetic clinic hours is 1500 hours to 1745 hours.

130. Petitioner told the nursing staff that it is misrable sitting and waiting for chow after taking insulin, because he feels his blood sugar dropping. He feels real bad and gets real shaky and feels like he is going to fall out.

131. On 5 March 2019, Petitioner filed a Step One grievance.

132. On 14 March 2019, while housed on seven building, Petitioner informed Rodriguez that he needed to go to go to evening diabetic treatment. She told him he couldn't go. Petitioner asked several more times with the same answer. Eventually she told Petitioner to, "Shut the fuck up and leave me alone. You are not going to the infirmary. I am going home, so your gonna have to go when I'm gone." Petitioner did not receive his treatment.

133. On 17 March 2019, Petitioner informed Rodriguez that he needed to go to mid-day diabetic treatment. She told him no, because treatment is only in the morning and the evening. Petitioner presented his diabetic pass, but she still refused to let him go.

134. Over the next couple of hours Petitioner made several attempts to go to his diabetic treatment. Rodriguez told Petitioner that she was too busy and to leave her alone.

135. At approximately 1230 hours, Petitioner asked to go to the infirmary for treatment. She said, "fuck you whinny ass. Just go get your fucking insulin and leave me the fuck alone." Petitioner was late and almost wasn't allowed treatment.

136. Upon information and belief, Rodriguez was telling inmates that Petitioner is a snitch, because he wrote a grievance on her. Upon information and belief, Rodriguez was encouraging inmates to retaliate on her behalf.

137. On 18 March 2019, Petitioner filed a Step One grievance. It came back unsubstantiated and no further action warranted. Petitioner filed a Step Two grievance on 17 April 2019.

138. On 2 May 2019, while house on twelve building, Petitioenr spoke with Bui about her forcing diabetics to go to ten building infirmary too early for treatment, and being denied if they don't get their on time. Bui told Petitioner if diabetics don't make it by 0345 hours, she would say they refused treatment.

139. Petitioenr spoke with medical staff and Delone, Bellanger, and Midkift in person and by I-60s about what Bui was doing and saying to twelve building diabetics. Petitioner told them that Bui had to also do general population, so she didn't have time to do both. They reaffirmed diabetic clinic times and said she could turn twelve building diabetics away.

140. On 3 June 2019, Petitioner went to Ad-Seg nursed station for mid-day diabetic treatment with D. Johnson at approximately 1105 hours. After treatment with insulin Petitioner went to the Ad-Seg chow hall for a meal. Food service officer White told Petitioner he could not eat.

141. Petitioner told White that his pod had already eatten and just received insulin and needed to eat. She still told Petitioner he couldn't eat. Officer Rankins was sitting in the kitchen overhearing the conversation and yelled to Petitioner he couldn't eat.

142. Petitioner reinterated his conversation to White and Rankins, but was still denied a meal. Rankins told Petitioner he could stand in line for all she cared and left. After approximately fifteen minutes she returned and told Petitioner to go to his pod. Petitioner told her he had to eat a meal after taking insulin, but she told him that she didn't care.

143. Petitioner requested rank. Rankins told him she wasn't calling for rank. D. R. Jones came around the corner from A-Hallway and started yelling obsenities at Petitioner and to go to his pod. Petitioner repeated his earlier conversation

24.

he had with White and Rankins to D. R. Jones. She said she didn't care.

144. Petitioner explained that Woodward told the diabetics that they could eat imediately after taking insulin and that he let rank know. D. R. Jones yealled at Petitioner saying, "I don't give a fuck what Woodward said. I'm telling you to go back to the pod." Petitioner complied.

145. D. Johnson was returning from an ICS and was walking by as Petitioner was talking to D. R. Jones. Petitioner informed D. Johnson what was going on and asked her to please help. She said she didn't care and that it was a security issue.

146. Petitioner returned to his pod and asked the other diabetics if they had already eatten to which they answered yes. They also told Petitioner they saw him being yelled at by White, Rankins, and D. R. Jones, with D. Johnson watching as they pick their trays up.

147. After a while Petitioner went back to the kitchen to try to eat, but the food was put up. An inmate kitchen worker was able to find some left overs to give Petitioner a try of food.

148. Later that evening Petitioner tried to go to evening diabtic treatment. He presented his pass to the rover, which said she would call D. R. Jones. D. R. Jones told the rover no and in turn she notified Petitioner.

149. Over the next few hours Petitioner and other diabetics kept trying to go to treatment, but was told no. Petitioner was finally able to go to treatment at approximately 1845 hours, talking the nurse into it, since it was past treatment time.

150. On 4 June 2019, Petitioner filed a Step One grievance.

151. Due to the inadequate medical treatment of his diabetes Petitioner has suffered hypoglycemia and hyperglycemia. He has suffered several instances of altered levels of cinciuosness. Petitioner has suffered his diabetic neuopathy of the feet, legs, and intestines. He has suffered diabetic retinopathy. Petitioner

25.

152. Due to being denied or delayed consistant diabetic treatment and an adequately nutritional meal within a resonal time of receiving insulin, Petitioner's A1C level has been high. His pain levels increase, such as, but not limited to, both feet and hands, and the lower legs with burning,tingling, numbness, or weakness as his blood sugar increases. Petitioner's balance and muscle tone has been affected, which interfere with his gait and causes pain.

153. Plantiff now sccumbs to severve depression and anxiety each time he has to attempt to go to the infirmary for diabetic treatment. Also, the interaction of prison staff when requesting and presenting his pass for treatment has made Plaintif fear being physically attacked, verbally abused and threatened, or retaliated against if he has to submit grievances shen he is refused treatment and meals. Plaintiff has lost trust in prison staff.

### CLAIM TWO: SEXUAL ABUSE AND MISCONDUCT

154. on 17 july 2017, at approximately 0810 hours, Plaintiff was in line by eveln building and chapel gate for Veterans Incarcerated Group (VIG) color guard practice at the chapel. There were approximately six new correctional officers being trained by Guillory-Jones in pat search procedures lined up down the side-walk in front of one building. They were searching inmates prior to going into the chapel.

155. Officer Gabba called Plaintiff to be searched. Plaintiff complies by going to Gabba and turning his back towards Gabba as was proceedure. Gabba placed a hand on each side of Plaintiff just under the armpits. Next he slowly slid his hands forward onto Plaintiff's chest. This made Plaintiff very uncomfortable and knew this to be improper procedures, because of the many pat searches he had received over the many years of his incarceration.

156. Gabba then slightly leaned against Plaintiff's back with his chest and squeezed Plaintiff's chest. Then Gabba took Plaintiff's nipples in each hand between his fingertips and started twisting them.

157. Plaintiff imediately told Gabba to stop loud enough for everyone to look towards Gabba and him. When Gabba finished his search Plaintiff stepped away from Gabba. Plaintiff felt very uncomfortable, furious, horrified, disgusted, sick to his stomach as if to puke, and extremely embarrased. The other inmates and guards laughing and pointing imitating what Gabba had done to Plaintiff.

158. Plaintiff asked Gabba why he did that to him? Gabba only grinned at Plaintiff. Plaintiff imediately told Guillory-Jones what had just happened to him, although she more than likely saw it, because she was laughing like everybody else. She started yelling at Plaintiff to, "Get the fuck back in line before I write you a case." Plaintiff complied.

159. On the way into the chapel and once inside, inmates were laughing at Plaintiff and mimicking what Gabba had done to him. Plaintiff could not concentrate on color guard practice, because of what Gabba had done to him and the others making fun of him.

160. After count cleared Plaintiff went to the infirmary for his mid-day diabetic treatment. Once there he informed the officer posted there about what had happened to him by Gabba and requested to speak with someone from mental health.

161. The officer called Joshua Loflin (Loflin). Plintiff went to Loflin's office where he told him what Gabba had done to him, eveybody making fun of him and teasing him, an how it all made him feel. Loflin told Plaintiff to file a grievance and to contact PREA.

162. Plintiff submitted I-60s to Safe Prisons/PREA and OIG, which were never responded to. On 24 July 2017, Plaintiff filed a Step One grievance. It came back unsubstantiated. Plaintiff filed a Step Two grievance on 21 August 2017. It came back unsubstantiated and no further action warranted.

163. On 5 February 2019, Plaintiff had a medical appointment with Dr. Miller. After vitals were taken by the nurse Plaintiff was sent to Miller's office. Miller pushed his stool towrds Plaintiff and told him to shut the door and sit against it.

Miller told Plaintiff not to let anybody in during the appointment, which is what he has done with me in previous appointments. This made me feel uncomfortable.

164. Miller was asking Plaintiff personal questions about his life while he was a child. Miller asked if Plaintiff grew up with a mother and father and if he had an abusive life growing up.

165. Plaintiff explained that he grew up with his father and mother and lived with his gandparents. He said it was an abusive life and was neglected. Plaintiff explained he ended up being placed a Cal Farley's Boys Ranch, which is a childrens home outside of Amarillo.

166. At the mention of the childrens home Miller started to ask a lot of personal question about life there. Miller asked how the house parents treat him. he asked if any of the boys picked on him. He asked if any of the house parents or boys touched Plaintiff inappropriately.

167. At this point Plaintiff felt very uncomfortable and didn't want to talk anymore. Plaintiff suspected that Miller saw how uncomfortable he was, so he told him a story of a friend that grew up there. Plaintiff tried to change the topic several times, but Miller  kept bring the conversation back to life at boys ranch. It took a long time before Miller eventually spoke about Plaintiff's medical issues.

168. Plaintiff was suffering from skin conditions on his legs, butt, and groin. Dr. Miller requested that Plaintiff pull his pants and boxers down to his ankles. Prior to or after the exam Miller did not wash his hand or wear gloves. Plaintiff asked about that . Miller told Plaintiff that he washed earlier and that gloves stopped him from properly feeling the affected areas.

169. During the examination Miller placed his chair in front of Plaintiff and sat in it. Miller started looking at Plaintiff's private parts and fondling them all around. This was done only a couple of inches away and to Plaintiff was taking too long. Plaintiff expressed this to Miller.

170. Miller started examining Plaintiffs thighs and legs, then told Plaintiff

28.

to turn around. Dr. Miller put his hands on Plaintiffs butt checks and started rubbing them. While doing this Miller asked Plaintiff if he wanted a prostate exam? Plaintiff said no. Every appointment Plaintff has had with Miller,  he was asked if he wanted a prostate exam. Plaintiff asked if the exam was finished, so he could leave, which Miller told him yes. Plaintiff left.

171. On 2 April 2019, Palintiff again saw Dr. miller for an appointment. Miller started asking Plaintiff if he was the one he talk to that was in the childrens home? Plaintiff reluctantly told him yes. This seemed to make Miller happy.

172. Dr. Miller tried talking to Plaintiff again about his childhood and about his experiences at the childrens hom. Plaintiff tried to change the subject several times only making Miller frustrated.

173. As previous exams Miller asked Plaintff to pull his pants and boxers down to his ankles. Miller did not wash his hands prior to or after the exam, nor wear gloves. Miller rubbed on Plaintiff's genitals, thighs, and butt cheeks in a creepy way. When behind Plaintiff Miller asked if he wanted him to do a prostate exam. Plaintiff said no. The nurse was not in the room this nor the privious exams.

174. On 16 April 2019, Plaintiff saw Dr. Miller again. Miller asked Plaintiff to pull his pants and boxers down to his ankles. As before miller did not wash his hands prior to or after the exam, nor wear any gloves. Again, a nurse was not present. Plaintiff told Miller that he really didn't want him touching him, especially without washing his hands and wearing gloves. Plaintiff also asked how come a nurse wasn't in the room with them? Miller said because the exam will be fast and the nurse is too busy.

175. During the exam Miller tried to talk to Plaintiff about the childrens home, but Plaintiff told him that he wasn't in the mood. Plaintiff told Miller all he wants is his conditions taken care of.

176. On 22 August 2019, Plaintiff had another appointment with D. Miller. Miller started to ask Plaintiff about the childrens home, but Plaintiff told him

he didn't want to talk about that. Miller seemed upset and frowned at Plaintiff. He told Miller he just wanted to get his medications and leave.

177. Miller told Plaintiff that he would have to examine his rashes or there wasn't anything he could do. Plaintiff told Miller he wasn't there for rashes and didn't want to show him anything. Miller told Plaintiff that if he won't show him anything, then he would have to leave, Miller told Plaintiff the exam wouldn't take too long and after that he would order Plaintiff what he needed.

178. Plaintiff reluctantly gave into the exam. Miller asked Plaintiff to pull his pants and boxers to his ankles. Miller did not wash his hands prior to or after the exam or wear gloves. There was no nurse present during the exam. Plaintiff mentioned all of this, but Miller told Plaintiif lets just get this over with.

179. After fonddling Plaintiff's genitals Miller moved behind Plaintiff. Miller rubbed on Plaintiff's butt cheeks. He put a hand on each butt cheek and started spreading them. It felt as if something was going into Plaintiff's anus. Plaintiff yelled at Miller to stop. Miller told Plaintiff thats all he needed and would take care of everything.

180. On 15 January 2020, Plaintiff filed a Step One grievance. It came back stating, "Due to the nature of your allegation your complaint was forwarded to the appropriate authority. The investigation revealed that there was no evidence to support your allegations of staff misconduct. No further actions is warranted." Plaintiff filed a Step Two grievance on 26 March 2020. It came back stating, "This issue has been reviewed by the Office of the Inspector General and that that office has determined that there is insufficient evidence to warrant opening a case. No further action will be taken."

CLAIM THREE: EXCESSIVE AND UNNECESSARY USE OF FORCE

181. Plaintiff realleges and incorporates by reference paragraphs 41-51.

182. P. Noykin was being extremely verbally abusive shouting expletives, racial slurs-white boy, white bitch, white piece of shit, white hoe-and sexual innuendos

towards Plaintiff. P. Boykin was extremely furious and grabbed Plaintiff very roughly by the arm, swung him around, grabbed the other arm forcing them at hard angles. Then P. Boykin jerked Plaintiff's arms down by the wrists slapping handcuffs hard onto his wrists.

183. Plaintiff told P. Boykin that he was hurting him bad and that he had torn rotory cuffs in both shoulders. Plaintiff told P. Boykin that it felt like he was going to pop his shoulders out of place. P. Boykin said, "Shut up bitch. Stop your whinning. This is what you get motherfucker. I don't care about your shoulders pussy. Cry home to your mamma now bitch."

184. Plaintiff was taken to the infirmary for a PHD exam where he told the nurse what P. Boykin had done to him. The nurse didn't check any of the injured and hurting areas. Plaintiff was then lock up in Ad-Seg.

185. On 11 December 2017, Plaintiff filed a Step One grievance. It came back as unsubstantiated and no action warranted. Plaintiff filed a Step Two grievance on 20 February 2018. It came back unsubstantiated and no further action warranted.

186. Plaintiff realleges and incorporates by reference paragraphs 70-79.

187. Plaintiff realleges and incorporates by reference paragraphs 88-108.

### CLAIM FOUR: DEPRIVATION OF OPRABLE PLUMBING AND EXPOSURE TO HAZARADOUS TOXIC SEWAGE

188. On 7 May 2019, Plaintiff and his celly Michael Anderson (Anderson) submitted I-60s to the unit plimbers for their toilet leaking and being clogged. Prior to filing the I-60s and in the course of several days, Plaintiff and his celly spoke with Clark, R. Y. Poullard, Wilson, C. R. Johnson, Bell Thompson, Bennett, and P. Boykin.

189. Wilson told Plaintiff and Anderson to, "Leave him alone or next time you come to talk to me I will whoop you asses." Each individual Plaintiff and Anderson were hostile and verbally abussive towards them. They were told one or more of the following: I'm too busy tell somebody else. Don't ask me again. Remind me if I forget. I have other things to do. I don't care. Oh well. Its not my problem.

190. Plaintiff and Anderson had to urinate and deficate in the clogged toilet, then try to force the contents down with their bare hands and a towel, which made a mess on the floor. Then they were forced to use a towel to mop up the contaminated water off the floor and wring it out in the sink.

191. Plaintiff and Anderson requested cleaning supplies and gloves, but were denied. After trying to force the contents down the toilet and clean up the floor, Plaintiff and Anderson requested to take showers. They were denied.

192. Plaintiff requested to be moved to a different cell with a working toilet. He was denied. He asked to use the dayroom toilet when he had to use the restroom. He was denied. He requested to eat meals out of the cell and in the dayroom. He was denied.

193. Plaintiff and Anderson experienced nausea and vomitting daiy in their cell due to the horriffic smell. The sewage attrated flys, roaches, pest, and rodents. Plaintiff and Anderson experienced severe headaches, buring and watery eyes, and buring and runny noses.

194. Upon belief and information guards failed to annotate the inoperable toilet in their security log. Upon belief and information, the response and repair times for work order-emergency incidents also-can be extremely long.

195. On 14 May 2018, Plaintiff and Anderson filed Step One grievances. It was eventually returned late to Plaintiff as toilet inoperable, work order issued, and allow additional time for parts and repairs. No further action is warranted.

196. Shortly after 14 May 2018, Plaintiff went on medical chain to the walls unit for an appointment at the Houston Veterans Medical Center in Houston. Plaintiff returned to Stiles approximately four to five days later.

197. Plaintiff was not housed in the same cell as the clogged toilet. He was placed in seven building, H-Pod, six cell. Shortly after he was moved to eight building, L-Pod, six cell.

198. Plaintiff's Step One grievance was sent to his old cell of the clogged

toilet first. Next, it was returned and delivered to H-Pod six cell. Finally, it was returned and delivered to him on eight building, causing a significant delay and past the deadline to file a Step Two grievance. Upon information and belief, the grievance went to the Walls Unit, then was rerouted back to Stiles.

199. At some point Plaintiff spoke to a grievance investigator on his unit about the Step One being delayed in answering and getting back to him The investigator told Plaintiff she would look into the matter and find where the Step One was and have it sent to him (which at some point it was). Upon information and belief, the grievance department is regularly behind on answering and returning grievances well past the due dates, misplaces them, and sends them to the wrong cell.

200. On 12 November 2018, Plaintiff filed a Step Two grievance. It was returned as grievable time period was expired with Offender Grievance Operations Manual appendix B attached.

### CLAIM FIVE: EXPOSURE TO HAZARDOUS EVIRONMENTAL TOXIC SMOKE

201. Upon information and belief, other inmates housed at Stiles have suffered from exposure to hazardous evironmental toxic smoke on or about the same dates as Plaintiff. Upon information and belief, other inmates have voiced their concerns fears, and complaints to prison and medical staff, as well as, through I-60s, letters, and grievances without any relief.

202. Plaintiff and other inmates have been exposed to other inmates-sometimes prison staff-smoking various drugs and tabacco. Further, inmates set fires using various items, such as, but not limit to, matresses, sheets and clothing, books, and other papers. Prison staff have been indifferent to these fires and drug use. They allow the fires to burn without extinguishing them. Prison staff keep providing materials to burn. Upon informationa and belief, prison staff have been bringing into Stiles various drugs and tabacco for inmates to use.

203. Due to exposure to these various toxic smoke Plaintif has suffered severe

headaches, difficulty breathing, eye irritation and burning, dizziness, sneezing, runny nose, fits of coughing that hurts and aggravates his back pain, irritated throat, and elevated heart rate. Further, Plaintiff suffered depression and axiety. Plaintiff also fears what injuries and diseasease may occur, such as, but not limi limited to, asthma, cancer, COPD, death, heart attck, heart disease, stoke vascular disease, and osteoporosis. Plaintiff also suffered difficulty sleeping and nasea.

### CLAIM SIX: UNSANITARY HOUSING AND CHOW HALLS

204. Upon information and belief, other inmates housed at Stiles have suffered from unsanitary living conditions and unsanitary chowhalls on or about the same dates as Plaintiff. Upon information and belief, other inmates have voiced their concerns, fears, and complaints to prison and medical staff, as well as, through I-60s, letters, and grievances as Plaintiff has without any relief.

205. Numerous insects, rats, mice, and other vermin, birds, cats, snakes, spiders, scorpions, and cockroaches infested the inmate housing areas and chow chow halls throughout the period of Plaintiff's confinement at Stiles from November 2011 untill the time of this complaint.

206. An exterminator did visit Stiles at approximately at ninety day intervals or more, but they onlytreated the common areas and guard areas. They never sprayed the cells, although Plaintiff and other inmates requested them to. When the areas that were treated roaches and vermin would run to the cells. As with the chow hall, the infestations would leave or go to an untreated area. After some time had passed, everything would return to the treated areas.

207. Upon information and belief, the chemicals used for treatment were not mixed properly, therefore being weak and uneffective.

208. In the housing areas the showers had no proper ventilation and were covered in mold, as well as, the restroom areas. Some of the restroom areas have stalactites from the continuous leaks from either rain or drains leaking from the upper levels.

209. The ventilation vents and ducts are clogged, filthy, and rusted. Windows are severely rusted and unable to close. The walls where windows are seated are rested through allowing for insects and rodents into the housing areas. There are birds living in the ventilation system in the dayrooms, which allow for bird droppings. Cleaning supplies, bleach, and other disinfectants are not available to inmates to clean. Upon information and belief, inmates have created a black market for trafficking and trading of cleaning supplies.

210. Building SSIs rarely clean-when supplies are available-due to trafficking and trading of drugs and other illegal items. Upon information and belief, many inmates pretend to be SSIs to be able to get to different hosuing locations for trafficking and trading, gang activity, to do drugs, and have sexual relations.

211. The chow halls have severe mold in them, including in the ceilings. The sheetrock is moldy and cracked. The paint is peeling. These particles oftne fall onto the serving line and food causing inmates to digest them.

212. The inmate chow hall attendents use dirty water to clean tables. Standing water on the floors is due to clogged drains. Birds fly around the chow halls and within the kitchen dropping their fecal matter everywhere.

213. The ventilation vents and ducts are clogged, filty, and rusted. Windows are rusted out and can not be closed. There are no window screens.

214. The unsanitary conditions has caused Plaintiff's nose, lungs, and eyes to beirritated. It has caused Plaintiff coughing fits and aggravated his allergies. The filty slimmy showers has cause Plaintiff to fall on several ocassions.

### CLAIM SEVEN: DENIAL OF FREE SPEECH, REDRESSING OF GRIEVANCES, DUE PROCESS AND RETALIATION

215. Plaintiff realleges and incorporates by reference paragraphs 29-199

216. On 26 July, 2017, Plaintiff was called to one building by the grievance department about the grievance he submitted about Gabba's sexual abuse and misconduct. The female investigator showed PLaintiff the grievance and varified that he wrote the. After varified that varfied, she told Plaintiff in Decative office

that he wrote it. after varificaion she took Plaintiff to P. Boykin's office where she handed the grievance to him.

217. P. Boykin told Plaintiff to come in and shut the door. P. Boykin told Plaintiff to sit in the chair next to him at his desk and threw the grievance on the desk towards Plaintiff. P. Boykin asked, "Did this shit really happen or are you just making it up?" Plaintiff told P. Boykin that the incident happened and explained the incident, everybody teasing him about it, and visiting with mental health, which told him to report the incident.

218. P. Boykin got hostile towards Plaintiff and started yelling. He told Plaintiff that, "You better not make me do paperwork. You better drop the grievance or you will regret it." Plaintiff told P. Boykin that it happened ans the security recordings would show it.

219. P. Boykin said, "This is some bullshit and you need to drop the grievance. Don't make me go through with the paperwork, because you will wish you hadn't." Plaintiff told P. Boykin that the incident happened and needed to be properly investigated.

220. Plaintiff told P. Boykin the security camera at the chapel gate and one building would show the incident. P. Boykin told Plaintiff he wasn't going to look at the security recordings, so he might as well drop the grievance. P. Boykin told Plaintiff it was his last chance to drop it or he would lock Plaintiff up in Ad-Seg for a long time. Plaintiff responded that he wanted the incident investigated. P. Boykin said, "Ok motherfucker. Have it your way. You are going to regret this."

221. Plaintiff was placed in a visitation phone both for approximately an hour. At some point Guillory-Jones stopped at the booth to stare at Plaintiff for approximately ten minutes. She gave Plaintiff mean evil looking stares bearing teeth and shaking her head. She walked off towards the break area and returned a few minutes later to stand and stare at Plaintiff for a short time. She again shook her head, grinned, and walked off.

36.

222. Plaintiff was taken to the infirmary for a sexual assault exam, which consisted in part of Plaintiff removing all of his clothes and pictures being taken. This was very humilitating for Plaintiff. After the exam Plaintiff was housed in Ad-Seg.

223. On 28 July 2017, Plaintiff was served with a false major disciplinary case for lying during an investigation. Plaintiff tried explaining that he wasn't lying, to look at security recordings, and that the case was retaliation for him not dropping the grievance against Gabba.

224. Some time after being served the case, counsel substitute Manual went to Plaintiff's cell. Plaintiff told Manual the incident happened and there was several witnesses and security recordings that would prove it. Plaintiff requested Manual to look into the witnesses and security recordings and have them at the hearing. Manual said she would. Upon information and belief, several witnesses and the security records were investigated by Woodward and he told one of the witnesses that it showed what Gabba did to Plaintiff.

225. On 16 August 2017, the disciplinary hearing was held with Knod, Manual, Plaintiff in person, and P. Boykin by phone. Plaintiff was in handcuffs, a waist belt, and leg shackels like a G-5 inmates. This made it impossible to write notes and go through paperwork.

226. Plaintiff felt that Knod was frustrated with Plaintiff. Knod said he wanted to get on with the hearing so he could get it over with. Plaintiff requested to speak with Manual so that they could cordinate his defense. Knod said whatever and to hurry.

227. Plaintiff asked Manual what she did to prepare and if she talked to witnesses and reviewed security recordings. She said she only reviewed the file. Plaintiff asked Manual what she was doing to do for his defense? She said nothing, but make sure Knod didn't violate his rights. Plaintiff asked Manual to at least review the two statements he had prepared, his notes, and questions he wanted to

ask. She told Plaintiff she didn't have time for that.

228. At the hearing Knod aske Plaintiff if he had a statement, which he did. Plaintiff read the first statement he had prepared, but when he tried to read the second one Knod stopped the recording and told Plaintiff he couldn't read the other statement. Plaintiff tried to explain that the second statement was part of his statement he wanted read into the recod. Knod told Plaintiff that the first statement was good enough and to just get on with the hearing.

229. Knod snatched the statements from Plaintiff's hands. Plaintiff told Knod those were his personal records and it was one reason he wanted them read into the record. Know told Plaintiff that he couldn't have the statements back and that they were now his. Plaintiff told Know that those statements were important for his defense and both should be read into the record.

230. Knod told Plaintiff that he would scan through the second statement and mark what he would allow Plaintiff to say into the record. Know only briefly looked at a couple of pages marking on them adn told Plaintiff that he was not going to allow any of it into the record.

231. Knod continued the hearing, but stopped the recording several times when Plaintiff attempted to comunicate with Manual. Knod told Plaintiff he couldn't talk to Manual and would kick him out of the hearing if he continued.

232. Plaintiff requested for witness and the security recordings, but was denied by Lnod. Knod told Plaintiff that it was too late to look at the security recordings, because they were recorded over every thirty days.

233. Plaintiff told Manual and Knod several times that Gabba did that to him and a proper invetigation needed to be done.  During the hearing Plaintiff tried to take notes, but at some point Knod snatched them and his pen away from him. Knod told Plaintiff that he couldn't take notes or write question for Manual. Knod told Plaintiff he should of had questions already prepared prior to the eharing. Plaintiff told Knod that there was no way to anticipate how the eharing would go, what testimony and evidence would be presented, or what follow-up questions to ask.

Knod stated , "Oh well. That's not my problem."

234. During P. Boykin's phone testimony Plaintiff kept telling Manual and Knod that he Couldn't hear what P. Boykin was saying and asked for the phone to be turned up. Plaintiff stated that he had hearing problems due to military service. Knod told Plaintiff that the phone was turned all the way up and would just have to deal with it.

235. Plaintiff continued to try to comunicate with Manual about his defense and Follow-up questions. Knod was furiated with Plaintiff and eventually kicked him out of the eharing.

236. Plaintiff receeived the results of the hearing through the mail indicating that he was found guilty. On 29 August 2017, Plaintiff filed a Step One grievance. It came back as no errors in procedure, due process, or the punishment phase, and the report would not be dismissed. Plaintiff filed a Step Two grievance on 2 October 2017. It came back as recods support guilty finding and no further action is warranted.

237. On 27 November 2017, Plaintiff was served a false disciplinary case written by P. Boykin. It sated in part, "...threatened to inflict harm on Capt. P. Boykin in that said offender said I'm going to call my family to take care of you in the free world."

238. on 4 December 2017, counsel substitute Laurie McCord (McCord) spoke with Plaintiff about the case to prepare for the disciplinary hearing. Plaintiff told her that P. Boykin was retaliating against him for not dropping the grievance on Gabba, other grievances filed against him, and saying that he was going to contact his family to report P. Boykin's actions to Huntsville.

239. Plaintiff told McCord that there was approximately twentyfive inmates that say the incident on the way to the chow hall. He stated that there was two officers present that witnessed what P. Boykin did and that helped him. Plaintiff said that they all should be interviewed and called as witnesses.

240. Plaintiff told McCord to review the security recordings from the cameras pointing towards B-turnout from Ad-Seg and ten building, seven and eight buildings, and seven and eight rec yards. Plaintiff told McCord the cameras in eight chow hall would help her track down witnesses from when they entered the chow hall.

241. Plaintiff explained the incident with Gabba and how P. Boykin lock him up in Ad-Seg for not dropping the grievance against Gabba. Plaintiff explained how P. Boykin told him that he would regret not dropping the grievance and has harrassed him ever since.

242. Plaintif explained to McCord that everytime P. Boykin sees him that he will go out of his way to confront him and make inappropriate vulgar remarks, stare and give dirty looks, and stop him from going to diabetic treatment, chow, or lay-ins. McCord told Plaintiff she would look into all the information he gave her.

243. On 7 December 2017, Plaintiff was being excorted to diabetic treatment and upon returning was stopped by Manual by Ad-Seg property room. Manual told the officer and Plaintiff that he needed to go into the property room so they could hurry up and get Plaintiff's disciplinary hearing over with.

244. Plaintiff told Manual and Knod that he was not prepared for the hearing, because he didn't have his prepared statement nor anything to take notes with. He requested to get those items from his cell. Knod told Plaintiff, "No. you have to go through the hearing without the. This is not going to take long anyways. You will be right in and right out."

245. Plaintiff told Know and Manual that there was no way to defend himself without the prepared statement and something for notes. Knod started geting mad and yelling at Plaintiff. He told Plaintiff, "Look. Do you wanna be here for the hearing or us do it without you? Your not going back to your cell for your stuff. That is final."

246. Plaintiff asked if he could at least talk to Manual, since she was not the original counsel substitute? Knod told Plaintiff to hurry up so they could start.

247. Plaintiff asked Manual what she had done to prepare for the hearing and Manual said nothing. Manual told Plaintiff that she didn't have to do anything for him, but make sure Knod doesn't violate his rights.

248. Plaintiff asked if she spoke with McCord and wha he and her had talked about and Manual said no. Plaintiff asked about the security recordings being available and she said no. Plaintiff asked why McCord was not at the hearing instead of her. Manual said she didn't know why and that she was just assigned. At this point Manual was getting mad and told Plaintiff she was done talking and to just get this over with.

249. Plaintiff made an opening statedment the best he could without his written statement. Plaintiff requested to review the security recordings, but Knod told him they were not available. Knod stopped the recording several times to tell Plaintiff that he would be kicked out of the hearing if he didn't keep his mouth shut. Plaintiff knew he would do it, because of last time.

250. Plaintiff tried communicating with Manual, but Knod was giving Plaintiff dirty looks shaking his head no. Plaintiff felt helpless to defend himself against the charges and just stood their until it was finished.

251. On 20 December 2017, Plaintiff filed a Step One grievance. It came back as charge appropriate, guilty verdict was supported by the evidence, and no further action is warranted. Plaintiff filed a Step Two grievance on 29 January 2018. It came back as evidence shows that Plaintiff did threaten to inflict harm on an officer and no further action is warranted.

251. Upon information and belief, P. Boykin has a very long history of harrassing and threatening inmates, and writing false disciplinary charges. Upon information and belief, Knod, Manual, Woodward, and other prison staff help P. Boykin to retaliate against inmates and ensure guilty verdicts for them.

252. On 7 August 2017, Plaintiff filed a Step One grievance due to his property missing. It was returned several times for submission in excess of one every seven

41.

days, although Plaintiff folled proper grievance proceedure. Plaintiff went and spoke to Ms. Davis in the grievance department about this issue.

253. Daivis told Plaintiff that they have been behind on grievances and having problems with Ad-Seg turning in inmates' grievances. She said there is not a grievance box in Ad-Seg, so inmates have to give guards their grievances to turn in through the mailbox. This causes a significant delay, because the mailroom has to process them, then reroute them to the grievance department.

254. Davis told Plaintiff he couldn't submit his grievanve on his missing property until Sgt. Kimble completed her investigation. She said that he had to allow the informal process first.

255. Kimble finished her investigation without any relief. On 25 September 2017, Plaintiff filed a Step Two grievance. It was denied as grievable time had expired. Plaintiff filed a Step Two grievance on 23 October 2017. It came back with an inter-office communication stating a Step Two appeal couldn't be submitted. Plaintiff was unable to receive his lost property nor be reinbursed for it.

256. On 9 October 2017, Plaintiff filed a Step One grievance in response to Step One grievance number 2018014006. It came back as no further action warranted. Plaintiff filed a Step Two grievance on 23 October 2017. It came back as unsubstantiated and no further action warranted.

257. On 13 September 2017, Plaintiff filed a Step One grievance in regard to his mail. It was sent back as inappropriate/excessive attachments. Plaintiff resubmitted the grievance on 3 October 2017, after removing the attachments. It was returned as submission in excess of one every seven days. Plaintiff resubmitted it, but it was returned again without any change.

258. On 12 January 2018, Plaintiff filed a Step One grievance in response to grievance number 2018070188. It came back as without merit and no action. Plaintiff filed a Step Two grievance on 10 April 2018. It came back as grievance number 2018070188, was resubmitted and under review with an extension and no further

action warranted.

259. Plaintiff has had multiple issues with the unit and central grievance offices for several years. Plaintiff has sent multiple I-60s and letters over the years to each office informing them of the issues and requesting help. They rarely responded to his requests. Plaintiff also tried to speak with someone at the unit grievance department only to be turned away and threatened with cases.

## VII. LEGAL CLAIMS FOR RELIEF

Claim One: Defendants were deliberately indifferent to Plaintiff by denying or delaying his diabetic treatment, despite their knowledge of his serious medical needs. Defendants' failure to allow proper medical treatment was done sadistically and maliciously causing Plaintiff to suffer unnecessary pain and suffering in violation of the U.S. Constitutional Eight Amendment prohibition against cruel and unusual punishment.

Claim Two: Defendants' heinous and reprehensible acts of sexual sexual assault and misconduct to Plaintiff were done sadistically, maliciously, and offensively to human dignity causing Plaintiff to suffer unnecessary pain and suffering in violation of the U.S. Constitutional Eight Amendment prohibition against cruel and unusual punishment.

43.

Defendants' acts were egregious and outrageous violating Plaintiff's right to be free of state-occasioned damage to a person's bodily integrity in violation of the U.S. Constitutional Fourteenth Amendment.

Claim Three: Defendants' acts of excessive and unnecessary use of force were done sadistically and maliciously for the purpose of causing harm causing Plaintiff to suffer unnecessary pain and suffering in violation of the U.S. Constitutional Eight Amendment prohibition against cruel and unusual punishment.

Defendants' acts were egregious and outrageous violating Plaintiff's right to be free of state-occasioned damage to a person's bodily integrity in violation of the U.S. Constitutional Fourteenth Amendment

Claim Four: Defendants' failing to provide operable plumbing and exposing Plaintiff to hazardous toxic sewage were done sadistically and maliciously causing a serious risk to life, health, and safety and causing Plaintiff to suffer unnecessary

44.

pain and suffering in violation of the U.S. Constitutional Eight Amendment prohibition against cruel and unusual punishment,

Claim Five: Defendants were deliberate indifferent to Plaintiff for exposing him to unsanitary living conditions and unsanitary chow halls causing a serious risk to life, health, and safety and causing Plaintiff to suffer unnecessary pain and suffering in violation of the U.S. Constitutional Eight Amendment prohibition against cruel and unusual punishment,

Claim Six: Defendants were deliberate indifferent to Plaintiff for exposing him to unreasonably high levels of dangerous environmental toxic smoke causing a serious risk to life, health, and safety and causing Plaintiff to suffer unnecessary pain and suffering in violation of the U.S Constitutional Eight Amendment prohibition against cruel and unusual punishment,

45,

Claim Seven: Defendants violated Plaintiff's rights under the First and Fourteenth Amendments to the U.S. Constitution in denial of free speech, denying and interfereing of redress of grievances, and retaliation,

Defendants violated Plaintiff's right to due process by allowing false disciplinory convictions and their handling of the disciplinary charges against him in violation of the Fourteenth Amendment to the U.S. Constitution.

## VIII. PRAYER FOR RELIEF

WHEREFORE, for the above reasons, Plaintiff respectfully moves this Honorable Court for judgments against all defendants as follows:

a. Declare that the acts and omissions of the defendants violate Plaintiff's constitutional rights and federal law;

b. Enter an injunction requiring the defendants, their agents, subordinates, employees, and all others acting in concert with them to cease their unconstitutional and unlawful practices

and to remedy their violations of the Constitution and the laws;

c. Enter an injunction requiring defendants to expunge the disciplinary convictions from Plaintiff's prison records and recalculate and credit all good time and work time as appropriate;

d. Award damages in Plaintiff's favor against all defendants in an amount sufficient to compensate him for the pain and suffering due to deliberate indifference and intentional misconduct of defendants, but in no event less than $750,000;

e. Award punitive damages in Plaintiff's favor against all defendants in an amount sufficient to punish them for their conduct and to deter defendants from committing similar acts in the future, but in no event less than $750,000;

f. Award to the Plaintiff reasonable costs and attorney fees; and

47.

g. Grant the Plaintiff such other relief as the Court may deem just and proper.

h. Trial by jury is hereby demanded on all claims alleged herein, and the parties are hereby given notice pursuant to Fed. R. Civ. P. 38 (b)-(c).

Respectfully submitted this 1st day of March 2024.

Latthen C. Douglas - Plaintiff, Pro Se
TDCJ No. 1746123
State Unit Michael Unit
2664 FM 2054
Tennessee Colony, TX. 75886

## IV   VERIFICATION

Pursuant to 28 U.S.C. §1746, I, Latthen C. Douglas, declare and verify, under penalty of perjury that I have read the foregoing and that it is true and correct to the best of my knowledge and belief.

Executed this 1st day of March 2024.

Latthen C. Douglas

48.

Lorthen L. Douglas
TDCJ No. 1746123
Michael Unit
2664 FM 2054
Tennessee Colony, TX. 75886

1 March 2024

U.S. Dist. Court
Eastern Dist. of Texas
Beaumont Division
District Clerk
300 Willow
Room 104
Beaumont, TX. 77701

RE: Douglas vs. Boykin, et al
    Civil Action No. 1:19 cv 306

Dear Clerk:

    Please find one original and one copy of an amended
complaint. Please file the original with the Court for
consideration. Please date-stamp the copy and return it to
me in the SASE.
    Thank you for your assistance.

Sincerely,

Lorthen L. Douglas - Plaintiff, Pro Se

Latthen C. Douglas
TDCJ No. 1746123
Michael Unit
2664 FM 2054
Tennessee Colony, TX. 75886



CLERK, U.S. DISTRICT COURT
RECEIVED

MAR 0 7 2024

EASTERN DISTRICT OF TEXAS
BEAUMONT, TEXAS

U.S. District Court
Eastern District of Texas
Beaumont Division
300 Willow
Room 104
Beaumont, Texas 77701

Legal Mail